UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

CHRISTOPHER VAN SALES                    CIVIL ACTION NO. 07-cv-0865

VERSUS                                   JUDGE HICKS

WARDEN LOUISIANA STATE                   MAGISTRATE JUDGE HORNSBY
PENITENTIARY

## REPORT AND RECOMMENDATION

**Introduction**

Christopher Van Sales ("Petitioner") and David Matthew Waters were charged with the second-degree murder of their friend, Greg Farmer. A Bossier Parish jury found Petitioner guilty, and he was sentenced to a term of life in prison. The conviction and sentence were affirmed on appeal. State v. Van Sales, 867 So.2d 849 (La. App. 2d Cir. 2004), writ denied, 899 So.2d 569 (La. 2005). Petitioner also filed a state post-conviction application. He now seeks federal habeas relief on several grounds. It is recommended, for the reasons that follow, that his petition be denied.

**Relevant Facts**

The facts surrounding the crime must be reviewed to give context to several of the claims, and the facts are directly relevant to the claim of insufficient evidence. The state appellate court set forth the facts at great length. Petitioner contests that court's conclusion that the evidence was sufficient to prove guilt, but he has not taken much issue with that

court's recitation of the facts.  Accordingly, the facts set forth below are borrowed in part from the state appellate opinion, with supplements based on this court's review of the record.

On the evening of January 11, 2001, Petitioner left the home he shared with his girlfriend, Angela Gilmore, at about 8:00 p.m. in Gilmore's 2000 Cougar. He was wearing yellow windpants, a shirt and shoes. Defendant told Gilmore that he was going to "hang out" with his friends, Gregory Farmer (the victim) and David Waters (also known as "Snotty"). Petitioner did not return home again until 1:00 or 2:00 the next morning, and he was wearing different clothes – jeans and a different shirt. Gilmore never saw the yellow pants again.

Michael Gorman testified that, on January 11, 2001, he and Richard Hollis, Waters and Petitioner were at Waters' trailer home in Haughton "doing drugs" – using the methamphetamine that Hollis had cooked. Gorman mentioned to the others that he thought that Gregory Farmer was a "snitch," citing discovery documents that he claimed showed Farmer was a confidential informant for the police in a criminal case pending against him. (Gorman admitted at trial that the documents did not contain the victim's name. Tr. 1234.) Waters and Petitioner decided to go looking for Farmer.

At about 8:00 or 8:30 that evening, Farmer visited his best friend, Casey Crews, at her apartment in Bossier City. Farmer and Crews had made tentative plans to go out that night. Instead, Farmer, Crews, and Crews' boyfriend "hung out" at Crews' apartment for a while. Farmer left the apartment for a short time to visit a friend and, while he was gone, Waters

telephoned Crews' home looking for Farmer. When Farmer returned to Crews' apartment, he attempted to telephone Waters.

Later, Waters and Petitioner arrived at Crews' apartment. They took Farmer into the bathroom to talk, and they confronted him about Gorman's accusation that he was a snitch. After about five minutes, Waters, Petitioner, and Farmer came out of the bathroom. Crews and Waters testified that it was obvious that Farmer was upset. He was hitting his fists together and telling Waters and Petitioner, "Take me to him."  Farmer said that he did not have anything to prove, but he nonetheless wanted to go with Waters and Petitioner to see Gorman. The three soon left Crews' apartment. Farmer telephoned Crews later that night to tell her that, if anything happened to him, he was at the end of Busby Road. Crews said that Farmer sounded worried during the call.

Back at Waters' trailer, Gorman heard Hollis answer a telephone call. After hanging up the telephone, Hollis told Gorman that Petitioner, Waters, and Farmer were on their way to the end of Busby Road (near the trailer), and they wanted Gorman to meet them down there so Gorman and Farmer could fight. Gorman declined, saying that he wanted nothing to do with it.

Waters testified that he was at his trailer with Hollis, Gorman, and Petitioner on the evening of January 11, 2001, getting ready to go out to a club with Farmer. Waters had been good friends with Farmer and his family for years. Waters had also been friends with Petitioner for a long time. Waters testified that he let Hollis live in his trailer so Hollis could

supply Waters' drug habit with the methamphetamine lab set up in a rear bedroom of the trailer. Each of the men at Waters' trailer that evening were using drugs.

When Waters was about to leave the trailer to pick up Farmer to go out, Petitioner asked if he could go with him to confront Farmer. Petitioner drove Ms. Gilmore's Cougar, and Waters rode with him. Waters recounted how he and Petitioner found the victim at Crews' apartment, confronted him in the bathroom, Farmer denied the accusation he was a snitch, and Farmer said he wanted to confront Gorman. Not wanting a fight at the trailer, Waters and Petitioner left Farmer at the end of Busby Road and returned to Waters' trailer to tell Gorman that Farmer wanted to confront him. A few minutes later, according to Waters, Farmer walked up to Waters' trailer and banged on the front door in an attempt to get Gorman to come out, but Gorman refused. As Waters was trying to calm Farmer down on the front porch, Farmer told Waters that he did not want to go out anymore. Waters asked Petitioner to take Farmer home. Petitioner, Waters, and Farmer left in Ms. Gilmore's Cougar.

Hollis testified that, before the trio left, Petitioner asked Hollis to go to a back room with him. Petitioner said he need to "take care of something." Petitioner asked Hollis for one of his crossbows, but Hollis said no. Petitioner then asked if Hollis had a "knife or anything," and Hollis gave him a stainless steel knife with a four-inch blade. Hollis was shown the knife recovered at the scene, and he said that was not the one he loaned Petitioner.

Waters testified that Petitioner, instead of taking Farmer home, drove to the end of Little League Road and stopped the car. Petitioner said that he wanted to show his two

passengers a shortcut to a house that he and Waters had talked about robbing. The three men got out of the car, but Petitioner told Waters he wanted to talk to Farmer alone and asked Waters to leave. Waters then drove the Cougar to a Circle K store in Haughton and bought some beer. After a short while, Waters drove back to pick up Petitioner and Farmer. Waters did not see anyone as he stopped the car, so he got out of the car, urinated, and, as he was returning to the car, saw one person running toward the car.

Petitioner, who was alone, jumped into the passenger side of the car. From the interior car light, Waters saw that Petitioner had blood all over him and had a knife in his hand. Waters testified that he could smell the blood and kept asking Petitioner where Farmer was and what had happened. Petitioner told Waters that he "had to do it" and yelled at him to "just drive." Waters, who was in shock and who was now afraid of Petitioner, drove back to the trailer. As Waters questioned Petitioner about what had happened, Petitioner answered, "Snotty, just calm down. I did this before I know (sic) what I'm doing. Just chill out."

At the trailer, Petitioner showered, changed clothes, and put his bloody clothes (including yellow windpants) in a trash bag. Petitioner put on Waters' blue jeans, white t-shirt, a flannel shirt, and some black tennis shoes. Waters gave Petitioner a can of lighter fluid and the trash bag, and he and Petitioner left the trailer in Waters' car. Waters drove Petitioner to Bellevue Road and left him there for about 30 minutes. After Waters returned for Petitioner and the two got back to Waters' trailer, Petitioner left in Ms. Gilmore's Cougar to go home.

On the morning of January 12, 2001, a person out for a walk discovered Farmer's body off Little League Road. Farmer's leather jacket had a puncture-type tear near the zipper area, and there was a pool of blood on the edge of the blacktop road. The body was located between two logs some distance off the road. Between the pool of blood and the logs were more blood and drag marks. Farmer was in the fetal position, with his pants pulled down to his ankles, apparently from being dragged by the arms through the mud and brush. Investigators recovered several pieces of evidence at the scene, including cigarette butts, a beer can, and a knife that was in the middle of the road about 100 feet away from the scene. An autopsy revealed that Farmer died of scores of penetrating stab and incised wounds that penetrated the head, neck, and torso, resulting in massive blood loss.

The investigation led to the questioning and arrests of Waters and Petitioner. Waters gave a statement to police about what happened. (He was later allowed to plead guilty to accessory after the fact.) Waters' statement to police that he drove to the Circle K store in Haughton and bought some beer was corroborated by the store surveillance camera and the store clerk.

The investigation also revealed a "burn scene" about 100 feet into the woods off Bellevue Road. The residue from the burn indicated that clothing, including shoes, had been burned recently. Castings were made of several shoe impressions at the burn scene, and they matched the shoes that Petitioner was wearing at the time of his arrest.

DNA analysis of blood samples from the passenger seat of Ms. Gilmore's Cougar matched the victim. The knife recovered from near the crime scene, however, did not contain any of the victim's DNA. Also, Hollis testified that the knife found at the scene was not the same knife that he gave to Petitioner that night.

While jailed pending trial, Petitioner told his cellmate, Michael Knight, the story of how he and his "fall partner" were involved in the homicide of  Greg Farmer. Knight later testified at trial for the prosecution. He testified that Petitioner told him that he had learned of a discovery package that included Farmer's name as an informant in some drug arrests. Petitioner related to Knight that they planned to pick up Farmer, carry him to a secluded place, and beat him up, because Farmer was a snitch and "deserved to die." Petitioner described to Knight how he and his fall partner drove Farmer to a dead-end road, and he instructed his fall partner to leave in the car.

At this point, Petitioner told Knight, he and Farmer got into an argument over Farmer being an informant and Petitioner "just snapped," lashed out and stabbed/sliced his "best friend" Farmer in the throat. Petitioner admitted to Knight that he slashed or stabbed Farmer in the throat multiple times and that Farmer was gurgling blood, so Petitioner attempted to stab Farmer in the chest and stomped his head in an attempt to put his friend out of his suffering. Petitioner told Knight that, when Farmer stopped gurgling, he dragged the body into a cut-over area and tried to cover it with limbs. Petitioner also told Knight that a knife was found at the scene, but it was not the knife he used. Petitioner said that the knife he used

would never be found because it was at the bottom of the river. Knight testified that Petitioner also described how his fall partner took him to change clothes and then to the woods to burn the clothes he wore during the crime.

Knight said he advised Petitioner it was best not to talk about his case. Petitioner talked anyway, telling Knight that he "didn't feel bad about what he did to Greg (Farmer), but he felt bad what it would do to his family because he said that Greg's father had practically raised him from a young child up, and he just wanted to talk about it."

**Sufficiency of the Evidence**

Petitioner argues that the evidence was not sufficient to prove his guilt of second degree murder.  In evaluating the sufficiency of evidence to support a conviction "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 99 S.Ct. 2781, 2789 (1979).  The trier of fact has broad discretion to "resolve conflicts in testimony, to weigh evidence, and to draw reasonable inferences from basic facts to ultimate facts." Id. The Jackson inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." Herrera v. Collins, 113 S.Ct. 853, 861 (1993).

The Louisiana appellate court cited and applied the Jackson standard on Petitioner's direct appeal, so its decision was not "contrary to clearly established Federal law," and

Petitioner can obtain habeas relief only if the State court's decision was an "unreasonable application" of Jackson.  28 U.S.C. § 2254(d); Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000); Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001).

Under the unreasonable application clause, a federal court is permitted to grant the writ if the state court has identified the correct governing legal principle from the Supreme Court's decisions but unreasonably applied that principle to the facts of the prisoner's case. Williams, 120 S.Ct. at 1523. Even if the federal court, in its independent judgment, has a firm conviction that the state court was incorrect in its application of a federal constitutional principle, that alone does not permit the federal court to grant habeas relief. Relief is not permitted unless the state court decision was so wrong as to be objectively unreasonable. Lockyer v. Andrade, 123 S.Ct. 1166, 1175 (2003). And it is only the state court's ultimate decision, not the quality of its analysis or opinion, that is at issue. Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002)(en banc).

Petitioner argues that the evidence against him was largely circumstantial, and he cites a Louisiana statute regarding circumstantial evidence that requires the prosecution exclude every reasonable hypotheses of innocence to convict.  See La. R.S. 15:438.  A federal habeas court does not apply the Louisiana circumstantial evidence standard found in La.R.S. 15:438. Only Jackson need be satisfied, even if state law would impose a more demanding standard of proof.  Foy v. Donnelly, 959 F.2d 1307, 1314 n.9 (5th Cir. 1992).

The state appellate court reviewed the evidence at length and discussed the elements of second-degree murder, which is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm.  La. R.S. 14:30.1.  Van Sales, 867 So.2d at 855-58. The evidence showed that Petitioner stabbed or cut the victim 50 times or more, so it was reasonable for the jury to find that Petitioner acted with the specific intent to kill or at least inflict great bodily harm. That intent was further evidenced by Petitioner's cellmate's testimony that Petitioner confessed he had planned to beat the victim because he was a snitch and deserved to die, and Hollis's testimony that Petitioner asked him for a weapon before the crime because, Petitioner said, he had something to take care of.  Cellmate Knight's testimony portrayed Petitioner as confessing to and even acting out for Knight a cold blooded murder.

Petitioner submits the possibilities that Waters or Gorman killed Farmer and manipulated the evidence to frame Petitioner.  He also submits that Farmer might have pulled the knife that was found at the scene and threatened Petitioner, who panicked and killed Farmer in self-defense.  Those are perhaps possibilities, but there was no testimony or other significant evidence to suggest such a scenario.  There was, on the other hand, ample evidence to support the jury's conviction of Petitioner for second-degree murder.  The state appellate court's application of the Jackson standard to the facts in this record was entirely reasonable, so habeas relief is not permitted.

**Voir Dire Commitments**

The Fourteenth Amendment's due process clause requires the impartiality of any jury empaneled to try a case.  Morgan v. Illinois, 112 S.Ct. 2222, 2228 (1992).  State courts and lower federal courts have often held that there may be circumstances where a party's manner of conducting voir dire prevents an impartial jury and triggers a due process (or Sixth Amendment) violation.  The questions that are often frowned upon are those that in effect ask a juror to state how he would weigh evidence not yet heard or decide in advance the facts in the case.  See U.S. v. Fambro, 526 F.3d 836, 848 (5th Cir. 2008).

Petitioner complained in his post-conviction application and in his federal petition that his due process right was violated because prosecutor Melissa Sugar, during voir dire, elicited promises and commitments from prospective jurors.  Petitioner pointed to a request by the prosecutor that a juror "promise and remember to give the state a fair trial, just like the defense."  The prosecutor also told jurors that the judge would instruct them on the law and that they must apply the facts to that law, whether or not they agreed with the law.  The prosecutor explained that she did not have to prove the case "beyond all doubt" but beyond a reasonable doubt.  She asked if a juror could vote to convict if the State based its case on circumstantial evidence that the juror believed.  In her opening statement, the prosecutor said that she would return in her closing argument and ask the jury to return a guilty verdict "and you promised me that if I prove my case you could do it."  Petitioner cites other voir dire to which he objects, but this is a fair summary of his principal objections.

Petitioner presented his claim to the state court as a due process violation, but he relied heavily upon Louisiana jurisprudence regarding the proper scope of voir dire.  The trial court judge recognized that law and held:  "After careful review of the excerpts from voir dire that petitioner cites, the court finds that these questions were not improper."  The judge found that the questions did not tend to commit prospective jurors to a certain verdict.  Rather, the prosecutor was trying to find jurors who would be fair to both sides.  Tr. 1646.

The state appellate court denied a writ application with a single sentence of explanation: "The applicant's claims are unsupported by any evidence and are conclusory claims at best, and the trial court did not err in denying relief."  Tr. 1652.  The Supreme Court of Louisiana denied a writ application (Tr. 1654) with a reference to La. C. Cr. P. art. 930.8, which imposes a two-year time limit to a file a post-conviction application.

If Article 930.8 actually applied, there is a great likelihood that this federal petition would also be untimely or subject to a procedural bar. But the State has not raised either defense, and the undersigned has reviewed the record and found that Article 930.8 was inapplicable. Petitioner timely filed his post-conviction application within the two year limit. The Supreme Court of Louisiana denied a writ application on direct appeal on April 22, 2005 (Tr. 1590), and Petitioner's post-conviction application was filed by the clerk of court less than one year later on April 11, 2006. Tr. 1591. The reference to Article 930.8 appears to have been a mistake by the state court, and no defense has been raised based on it, so it poses no obstacle to these habeas proceedings.

Habeas relief may not be granted on this claim unless the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). Under the "contrary to" clause, a federal habeas court may grant the writ only if the state court (1) arrived at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) decided the case differently than the Supreme Court has on a set of materially indistinguishable facts. Williams v. Taylor, 120 S.Ct. 1495, 1519 (2000).

Under the "unreasonable application" clause, a federal court is permitted to grant the writ if the state court has identified the correct governing legal principle from the Supreme Court's decisions but unreasonably applied that principle to the facts of the prisoner's case. Williams, 120 S.Ct. at 1523. Habeas relief is not permitted unless the state court decision was so wrong as to be objectively unreasonable. Lockyer, 123 S.Ct. at 1175.

Petitioner has not pointed to any Supreme Court decision sufficiently similar to this case to trigger the "contrary to" clause.  When considering the "unreasonable application" clause, this court must consider the specificity of the rule that the state court had to apply. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."  Yarborough v. Alvarado, 124 S.Ct. 2140, 2149 (2004).

There was nothing unreasonable about the state court's application of the general due process principles to the facts in this case.  The prosecutor did not have prospective jurors

commit to decide facts a certain way or return a particular verdict.  Rather, the prosecutor merely asked the jurors to commit to giving both sides a fair trial.  She also engaged in typical Louisiana state court voir dire to explain concepts such as circumstantial evidence and plea bargains. The questions did not even draw a defense objection from the seasoned public defenders who represented Petitioner. The voir dire provides no basis for habeas relief.

Petitioner also represents that the prosecutor at Tr. 470-76 told jurors "that they must convict without giving due consideration to statements given in exchange for plea bargains." That is false.  The prosecutor explained that witnesses to horrible crimes often have criminal records and sometimes you have to drain the swamp to catch a critter.  She also asked several prospective jurors if they had a problem receiving testimony from a witness who was involved in a crime but cooperated with the prosecution in exchange for a lesser charge or sentence. Some jurors expressed a dislike for the plea bargain system, but they generally acknowledge that it was part of the system.  There was absolutely nothing in the exchange to support Petitioner's false claim on this point.  Petitioner (or his inmate counsel) must realize that such bold misstatements of the record will never result in habeas relief but may result in sanctions on the filer.

**Right to Counsel; Inmate Informant**

Michael Knight, whose testimony was summarized above, was an important witness for the prosecution. Knight, before his arrest for two counts of aggravated rape and one count of sexual battery, was the Chief of Police in Oil City, Louisiana. Knight eventually pleaded

guilty to the single count of sexual battery. He served his time and was working as a commercial truck driver in another state by the time of Petitioner's trial.  Knight testified that he told police of his cellmate's confession because the facts were so gruesome, and he did not receive a reduced charge or sentence in exchange for his statement. Knight said that he reluctantly returned to Louisiana to testify because his conscience forced him to tell the "awful" story of the crime to the jury.  Tr. 1402-1420.

Petitioner argued in his post-conviction application that his Sixth Amendment rights were violated when Knight, a policeman at the time of his arrest, "questioned Petitioner outside the presence of counsel and after he had invoked his Miranda rights."  Petitioner asserted that the Bossier Parish sheriff knowingly placed Petitioner in the cell with Knight.

The trial court judge wrote that Petitioner was actually being housed at the Caddo Correctional Center (in neighboring Caddo Parish) at the time, and there was mention at trial that Knight was in the protective housing unit at "CCC." Tr. 1417.  A report by Bossier Parish investigators stated that they received a call from a Caddo deputy who told them that Knight had information about the Farmer murder.  The Bossier officers then interviewed Knight. The trial court judge observed that the record was "absolutely void of evidence" that Knight was intentionally placed in the cell to elicit information. Tr. 1647. This was the last reasoned state court decision on this issue.

The Sixth Amendment forbids the placement of a police informant in a cell for the purpose of eliciting information from a defendant after the right to counsel has attached.

Such actions, considering all of the circumstances, may raise to the functional equivalent of police interrogation.  U.S. v. Henry, 100 S.Ct. 2183 (1980).  But the Sixth Amendment does not forbid the admission of statements to a jailhouse informant who is placed in close proximity but makes no effort to stimulate conversations regarding the charged crime. Kuhlmann v. Wilson, 106 S.Ct. 2616 (1986).

Petitioner is not entitled to relief unless he shows that the state court's adjudication of this claim was contrary to or an unreasonable application of the relevant Supreme Court principles.  There is no record evidence that Knight was intentionally placed in the same cell with Petitioner or that Knight attempted to foster or stimulate conversation with Petitioner about the murder or on any subject.  Rather, Knight's testimony depicts Petitioner as freely describing the crime at length, in detail, and complete with demonstrations of some of the fatal attack. Knight said he warned Petitioner, as he began to confess, that  it was "in your best interest not to discuss your case with anyone but your attorney." Petitioner replied that he wanted to talk about it anyway. Tr. 1404. Petitioner has offered nothing but conclusory assertions that Knight played a different role.  Based on this record, the state court's decision was not objectively unreasonable, so there is no basis for habeas relief on this claim.

Petitioner raises a related claim that his right to a fair trial was violated when the prosecution was allowed to use the testimony of a "jailhouse snitch."  Petitioner argues that such witnesses have motivation to lie, that there should have been a pretrial hearing to determine the validity of the testimony, and that there should have been a jury instruction of

some sort on the issue.  Petitioner has not pointed to any clearly established law decided by the Supreme Court that would preclude the testimony of fellow inmates in criminal trials or that would require the other procedural devices Petitioner seeks.  Accordingly, there is no basis for habeas relief with respect to this claim.

**Jury Instruction**

A Louisiana statute, La. R.S. 15:432, provides examples of matters for which the law affords a presumption.  The list includes that a grand jury was legally constituted, that public officers have done their duty, that a defendant is innocent and sane, and that witnesses have told the truth.  At issue here is the presumption in the statute "that evidence under the control of a party and not produced by him was not produced because it would not have aided him."

Criminal defendants often point to witnesses or evidence not presented by the prosecution and ask the court for an instruction pursuant to the evidence-not-produced provision of the statute.  See e.g., State v. Ballay, 757 So.2d 115, 129 (La. App. 5th Cir. 2000).  The charge was given in this case, but not in that ordinary context.

The court properly instructed the jury not to single out any instructions and disregard others, that Petitioner was presumed to be innocent until each element of the crime was proven beyond a reasonable doubt, that Petitioner was not required to prove that he is innocent, and that the burden was on the State to prove guilt beyond a reasonable doubt. Tr. 1477.  The court went on to give instructions regarding direct and circumstantial evidence and other traditional matters.  It then offered the following:

> The defendant is not required to testify or call any witnesses or to produce any evidence.  Evidence under the control of a party and not produced by him creates a presumption that it was not produced because it would not have aided him.

Tr. 1480. The second sentence, if used in an appropriate case and context, might be a proper instruction, but its usage in this case essentially told the jury that Petitioner did not have to testify *but* the jury could presume that if he did not take the stand it was because his testimony would have not helped his case.

In Griffin v. California, 85 S.Ct. 1229 (1965) the trial judge instructed the jury that a defendant had a constitutional right not to testify and that the exercise of that right does not create a presumption of guilt or relieve the prosecution of its burden.  But the instruction also permitted the jury to "take that failure into consideration as tending to indicate the truth of [the State's] evidence and as indicating that among the inferences that may be reasonably drawn therefrom those unfavorable to the defendant are the more probable."  The Court held that this was error because the Fifth Amendment right against self-incrimination "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt."  85 S.Ct. at 1233.  See also Carter v. Kentucky, 101 S.Ct. 1112 (1981).

Petitioner argues that the instruction in his case created an improper presumption in the prosecution's favor that Petitioner did not take the stand because it would not have aided him. It appears that Petitioner is correct that the jury instruction in this case was unconstitutional.  When Petitioner raised the issue in a post-conviction application, the trial

court rejected it with the observation that the instruction "is a standard instruction" that did not relieve the State of its burden of proof.  Tr. 1560.  If the instruction is truly standard, then the undersigned strongly encourages the Bossier Parish courts to stop using that instruction – in the context and manner that it was used here –  lest resulting convictions be subject to attack and overturning on appeal or collateral review.

The conviction in this case need not be automatically vacated, because Griffin errors in the form of improper prosecutorial comment or jury instructions are subject to harmless error analysis.  Chapman v. California, 87 S.Ct. 824 (1967).  When an error in a state criminal trial is first recognized by the federal habeas court, the test for harmless error is the standard in Brecht v. Abrahamson, 113 S.Ct. 1710 (1993), which asks whether the error had a substantial and injurious effect or influence in determining the jury's verdict.  Fry v. Pliler, 127 S.Ct. 2321 (2007).  See also Davis v. Quarterman, 237 Fed. Appx. 903, 908 (5th Cir. 2007) (applying Brecht to a Griffin claim).

Any error in the jury instruction in this case was harmless under the Brecht standard. The remainder of the jury instructions were appropriate and emphasized the burden on the prosecution and the right of the defendant to neither testify nor present evidence.  The prosecutor's closing arguments focused on the elements of the crime and the evidence that she presented. There was no reference to Petitioner not testifying. Tr. 1432-48. And the State presented strong evidence that Petitioner armed himself in advance and went to meet the

victim with the intent to inflict great bodily harm if not kill.  On this record, the error is harmless for habeas purposes.

**Other Crimes Evidence**

Petitioner complains that the state court erroneously admitted other crimes evidence. Federal courts do not grant habeas relief based on mere errors in the application of state evidentiary rules or even consider it relevant whether state evidentiary rules were satisfied. Only federal constitutional errors that satisfy the demanding standards of Section 2254 merit habeas relief. The Due Process Clause provides a mechanism for relief when a state court wrongfully admits evidence, but only if the evidence is so unduly prejudicial that it renders the trial fundamentally unfair. Bigby v. Cockrell, 340 F.3d 259, 271-72 (5th Cir. 2003), citing Dawson v. Delaware, 112 S. Ct. 1093 (1992) and Estelle v. McGuire, 112 S.Ct. 475 (1991). The evidence must have had a substantial and injurious effect or influence in determining the jury's verdict. Wood v. Quarterman, 503 F.3d 408, 414 (5th Cir. 2007).

Petitioner points to testimony from David "Snotty" Waters that he asked Petitioner what happened, to which Petitioner answered, "Snotty, just calm down.  I did this before I know what I'm doing.  Just chill out."  Petitioner states that trial counsel objected to this as other crimes evidence.  A review of Waters' direct examination (Tr. 1350-78) includes that testimony (Tr. 1372) but no such objection.  Petitioner also fails to explain how testimony about his own comments about the murder at issue is subject to objection as "other crimes" evidence.

Petitioner also objects to testimony that there was a meth lab in Waters' trailer and that (unspecified) evidence was taken from a green automobile belonging to Richard Hollis. Petitioner says none of this evidence "was directly or indirectly linked to [Petitioner]."  The evidence of drug manufacture and usage was relevant to the relationship between the witnesses, Petitioner, and the victim.  It was the victim's alleged "snitch" status regarding a drug crime that led to his death.  Also, Waters testified that he drove the victim to the end of Busby Road to avoid a fight at his house, which could draw unwanted police attention to the drugs inside.  Tr. 1361. The evidence was relevant, and the state court was well within its discretion to admit it.

Petitioner also says that it was error to make any suggestion that he was involved in "another uncharged murder," but he does not articulate any facts or make any record reference to support this assertion.  The burden is on Petitioner in his habeas petition.  Absent his providing some factual basis for the claim, the court need not explore it further.  See U.S. v. Edwards, 442 F.3d 258, 268, n. 10 (5th Cir. 2006) (speculative and conclusory claims in a § 2255 or § 2254 proceeding do not merit a hearing) .

Petitioner makes a related claim that the jury was not properly instructed regarding other crimes evidence.  Petitioner's memorandum does not suggest what aspect of the charge he believes was incorrect or what additional charge he believes should have been delivered. Neither the prosecution nor defense offered any objection to the proposed jury instructions. Tr. 1430.  Petitioner's only elaboration of this claim is in his post-conviction application,

where Petitioner offered that the instructions given "did not exclude or limit the use of the (other crimes) evidence for credibility or impeachment purposes."  Tr. 1636.  There is no basis to find that any such instruction should have been given in the context of this case. That form of instruction might be proper if Petitioner testified and was impeached with a prior conviction, but Petitioner did not testify. There is no basis for habeas relief with respect to this claim.

**Ineffective Assistance of Counsel**

Petitioner asserts that his counsel was ineffective for several reasons.  Petitioner bears the burden of proving two components, deficient performance and prejudice, to establish ineffective assistance of counsel.  Counsel's performance was deficient only if he made errors so serious that, when reviewed under an objective standard of reasonable professional assistance and afforded a presumption of competency, he was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland v. Washington, 104 S.Ct. 2052, 2064 (1984).  Prejudice exists only if there is a reasonable probability that, but for the error, the result of the trial would have been different.  A reasonable probability is one sufficient to undermine confidence in the outcome.  Id. 104 S.Ct. at 2068.

The test for habeas purposes is not whether a petitioner made the showing required under Strickland. The test is whether the State court's decision – that the petitioner did not make the Strickland showing – was so incorrect as to be contrary to, or an objectively

unreasonable application of, the standards provided by Strickland's clearly established federal law. Wiggins v. Smith, 123 S.Ct. 2527, 2535 (2003).

Petitioner first argues that counsel was ineffective because she did not investigate former Oil City Chief of Police Michael Knight's status as a police officer and, based on the results, moved to suppress Petitioner's statements to Knight.  The state court denied this claim because there was no evidence that Knight was intentionally placed in Petitioner's cell.  Tr. 1648.  Knight's testimony did not indicate any such arrangement. Petitioner's habeas memorandum offers a single paragraph regarding this claim and does not provide any facts to suggest that further investigation by counsel could have resulted in the suppression of any evidence.  The state court's rejection of this claim, which was based on nothing but Petitioner's unsupported speculation, was not an objectively unreasonable application of Strickland.

Petitioner next argues that counsel was ineffective because she did not prepare a defense to the circumstantial evidence against him.  Petitioner argues that one of the other men involved in making drugs had more reason to kill the victim and that the circumstantial evidence did not absolutely prove his guilt.  The state trial court rejected this claim with the observation that counsel did prepare a defense and made a "very vigorous attempt to show or convince the jury that it was not murder but manslaughter."  Tr. 1649.  Petitioner's argument to this court does not so much fault counsel as attempt to reargue the sufficiency of the evidence.  The defense team had a difficult set of facts to defend against and, as the

trial judge noted, they offered a vigorous argument for a lesser verdict of manslaughter.  The jury was not persuaded, but that does not render their performance ineffective.  No relief is permitted on this claim.

Petitioner next argues that counsel did not investigate and prepare a defense to the specific intent element of second-degree murder.  Petitioner states that a better investigation would have revealed that he had a reliance upon drugs and alcohol that prevented him from forming specific intent.  He says that only an expert forensic psychiatric witness could have properly explained the evidence to the jury.  There was evidence of the use of drugs and alcohol, as there is in many criminal cases, but there was no indication that Petitioner was other than a fully functioning adult who had never received any treatment for mental or drug dependency problems. There is no factual basis to suggest that counsel overlooked a defense in this regard that had a reasonable likelihood of producing a different verdict.

Petitioner makes a related argument that counsel should have argued for the court to provide funding for expert testimony regarding specific intent.  Once again, there is not an adequate factual basis to suggest such a motion was viable or called for under the circumstances.  Many if not most criminal defendants have drug and alcohol issues, yet intoxication and similar defenses seldom succeed because of the demanding legal standards. The law presumes that the counsel in this case reviewed the facts and determined that there was not a basis for such a defense. Petitioner, who now has the burden, has not articulated

specific facts that could overcome that presumption. He is not entitled to a new trial because of this or any other issue asserted in the petition.

Accordingly,

**IT IS RECOMMENDED** that the petition for writ of habeas corpus be **denied**, and that Petitioner's complaint be **dismissed with prejudice**.

### Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within seven (7) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 7th day of April, 2010.

MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE